***********
The undersigned have reviewed the prior Opinion and Award based upon the record of the proceedings before Deputy Commissioner Ledford and the briefs and arguments of the parties. The appealing party has not shown good ground to reconsider the evidence, receive further evidence, rehear the parties or their representatives, or amend the Opinion and Award.
 ***********
The Full Commission finds as fact and concludes as matters of law the following which were entered into by the parties through the Pre-trial Agreement and at the hearing as
 STIPULATIONS
1. The parties are subject to and bound by the North Carolina Workers' Compensation Act.
2. The employment relationship existed between plaintiff and A. T. Williams Oil Company at the time of the injury, which is the subject of this claim.
3. This is an accepted claim wherein plaintiff injured her neck on August 17, 1998 during an automobile accident.
4. Plaintiff initially treated at Cobb Chiropractic Clinic following her accident and was referred to Henry A. Pool, M.D. who performed an anterior cervical diskectomy with fusion and instrumentation on December 10, 1998.
5. Plaintiff began treating with Jeffrey J. Schmidt, M.D., a neurologist, on October 25, 1999 for headaches, which treatment was authorized by the defendants.
6. Plaintiff was paid temporary total disability benefits pursuant to a Form 21 approved on September 27, 2000, from October 9, 1998 to November 17, 1998 and again from December 11, 1998 to January 18, 1999 and from April 12, 2001 to the present in the amount of $282.01 per week for a total of $18,685.02 in temporary total disability benefits.
7. Pursuant to a Form 26 approved by the Industrial Commission on October 2, 2000, defendants paid plaintiff $14,664.52 from April 20, 2000 through April 13, 2001 for a 17 percent permanent partial disability rating to plaintiff's back.
8. Defendants have paid medical expenses on behalf of plaintiff in the amount of $41,384.56 through the date of submission of the Pre-trial Agreement.
9. Plaintiff last worked for defendant-employer on January 10, 2000.
10. Plaintiff worked for Harris Teeter during 2000 as an assistant customer service manager earning $12.90 per hour working forty hours per week with occasional overtime.
11. On or about January 25, 2001, plaintiff was taken out of work with Harris Teeter by Jeffrey Schmidt, M.D. due to headaches.
12. On or about June 19, 2001, plaintiff was seen by her neurosurgeon, Henry A. Pool, M.D., who referred plaintiff to Albert Bartko, M.D. for therapy and medical management.
13. On July 6, 2001, Dr. Bartko released plaintiff to return to work with restrictions as outlined in his notes.
14. On July 21, 2001, Dr. Schmidt wrote a letter indicating that in his opinion plaintiff could not return to her position as a Cashier/Assistant Manager on a full time and permanent basis with her current level of pain, limitations and restrictions.
15. On October 18, 2001, Patrick Clifford, a Certified Vocational Evaluator, prepared a job analysis for a U-Check Out Customer Assistant with Harris Teeter.
16. On October 23, 2001, Dr. Bartko released plaintiff to return to full-time work as a U-Check Out Customer Assistant with Harris Teeter.
17. On November 8, 2001, Harris Teeter offered the U-Check Out Customer Assistant job to plaintiff with acceptance required by November 19, 2001.
18. Plaintiff responded to the U-Check Out Customer Assistant position with a letter dated November 16, 2001 from her attorney.
19. Defendants filed a Form 24 to suspend benefits on November 27, 2001.
20. Plaintiff again requested permission to be seen by Dr. Schmidt after the Form 24 hearing and the carrier, through its attorney, denied this request.
21. On December 27, 2001, Special Deputy Commissioner Myra L. Griffin disapproved the Form 24, which the Defendants have appealed.
22. On January 21, 2002, Dr. Jeffrey J. Schmidt released plaintiff to perform the U-Check Out Customer Assistant job at Harris Teeter.
23. Since Dr. Schmidt's approval of the U-Check Out Customer Assistant job at Harris Teeter, no openings have been available for the position.
24. On or about March 1, 2002, plaintiff moved to North Wilkesboro, North Carolina.
 ***********
Based upon the competent evidence of record, the Full Commission makes the following
 FINDINGS OF FACT
1. Plaintiff is currently 60 years of age, having a date of birth of August 3, 1942. Her present work restrictions are occasional lifting up to 10 pounds, no repetitive reaching, pushing, or pulling and the need to be able to alternately sit and stand, with some walking. These restrictions place her in the sedentary to light category of work.
2. The U-Check Out Customer Assistant ("U-Scan") position at Harris Teeter, which was identified in this case and offered to plaintiff, is one where an employee stands or sits at a monitor supervising customers at four check-out stations bagging their own groceries. The base of the monitor is approximately three to three to four feet high. The employee's primary tasks are to monitor customers coming through the checkout stations and assist them if necessary.
3. The evidence shows that both Dr. Bartko and Dr. Schmidt approved the U-Scan position as suitable for plaintiff, after reviewing a description of the position. The approval initially came from Dr. Bartko, the primary treating physician. The offer of this position was made in November 2001, and approved at that time by Dr. Bartko. Although Dr. Bartko was her primary treating physician and Dr. Schmidt had not seen plaintiff since June 29, 2001, she requested that Dr. Schmidt also review the position. Plaintiff never requested a return visit with Dr. Schmidt until the U-Scan position was offered to her. Dr. Schmidt subsequently approved the job description on January 21, 2002. By this time, the position was no longer available.
4. Plaintiff based her refusal of the U-Scan position on her perception that, contrary to Dr. Bartko's opinion, the position was outside of her physical limitations, primarily because it would require constant flexion of her neck. This assessment, however, is contradicted by the testimony of vocational expert, Mr. Patrick Clifford. He testified that this position did not require constant staring at the computer screen. Flexion refers to the bending of one's head down with one's chin toward one's chest, and constant flexion was not required by this position. In fact, the employee is able to freely move about and sit or stand while viewing the monitor and the customers checking out.
5. Plaintiff's testimony that she was unable to perform the job is also contradicted by Dr. Bartko's medical notes of October 22, 2001, when he discussed the job in detail with Mr. Clifford and plaintiff prior to his approval. At that time, plaintiff told Dr. Bartko that the job would involve sustained neck flexion, and also some mopping, neither of which are correct. Dr. Bartko then noted that he would follow up with Patrick Clifford regarding whether sustained neck flexion was required. After a thorough discussion with Mr. Clifford of the job requirements, on October 23, 2001, Dr. Bartko noted that constant monitoring of the screen was not required and that plaintiff could sit or stand and he approved the position.
6. Patrick Clifford, the vocational rehabilitation specialist, commenced vocational rehabilitation in April 2002. Mr. Clifford has identified many positions available in the area where plaintiff resides, which should be suitable for her given her restrictions. Both Dr. Bartko and Dr. Schmidt have also approved many of these positions. Mr. Clifford testified that these were not job offers, but descriptions of jobs available within plaintiff's community that would provide a vocational avenue for plaintiff to pursue.
7. The evidence of record indicates that plaintiff has been continuously non-compliant with the attempts Mr. Clifford has made to locate suitable employment. She has refused to even apply for most of the positions he has identified as suitable employment and which have been approved by the physicians, contending that she knows the job requirements better than her treating physicians. Plaintiff's insistence on seeing Dr. Schmidt and obtaining his approval for the U-Scan position contrasts with her subsequent refusal to apply for jobs approved by Dr. Schmidt.
8. Based on the job descriptions approved by Dr. Bartko and Dr. Schmidt, Mr. Clifford presented several potential jobs to Ms. Crews at an April 29, 2002 meeting at her counsel's office and requested that she apply for them. On May 2, 2002, plaintiff applied for one position at Dollar General. From the time plaintiff refused the U-Scan position on November 19, 2001 until May 2, 2002, she had not applied for any jobs.
9. Mr. Clifford's May 31, 2002 report shows that during his May 28, 2002 job search meeting with plaintiff, she stated that it was a waste of time applying for jobs he had identified because she knew what each job entailed and could not do them within her restrictions. When Mr. Clifford asked her to point out any jobs that she was interested in, she stated she could not see the computer screen even though she was sitting only 24 inches away. She stated she would follow up on job leads, but not that day. She also told Mr. Clifford that she would be providing a list of her current medical restrictions printed in red to prospective employers when she applied for work. Mr. Clifford is of the opinion that providing a slip of paper with medical restrictions printed in red ink at the time of application may negatively affect an employer's consideration of plaintiff's application.
10. Plaintiff's refusal of the U-Scan position at Harris Teeter was unjustified. At the time she refused the position, it had been approved by her primary treating physician, Dr. Bartko. In view of plaintiff's subsequent refusal to consider jobs approved by Dr. Schmidt, her insistence that Dr. Schmidt also approve the U-Scan position before she tried it was not reasonable.
11. Plaintiff's testimony at the hearing, as well as that from Patrick Clifford, shows that plaintiff has continuously refused to cooperate with Mr. Clifford or pursue employment opportunities. Plaintiff continues to be noncompliant with vocational rehabilitation.
12. Defendants have continued to pay temporary total disability benefits in the amount of $282.01 per week following the plaintiff's refusal to accept the U-Scan position at Harris Teeter. Defendants are entitled to terminate benefits until such time that plaintiff complies with vocational rehabilitation, and to be granted a credit for payments made to plaintiff since that date.
13. With regard to ongoing medical treatment and plaintiff's medical motion, the evidence indicates that plaintiff has been determined to be at maximum medical improvement. Plaintiff has been rated and paid for the 17% permanent impairment to her back, 12 percent as assessed by Dr. Henry Pool on Feb. 12, 1999 and an additional 5 percent per the opinion of Dr. Schmidt on April 20, 2000. Plaintiff's attorney asserts that in 2001, Dr. Schmidt assessed a revised twenty-two percent permanent impairment to plaintiff's back, but that issue is not before the undersigned.
14. To the extent that additional medical treatment, such as pain management and monitoring may be needed, defendants are entitled to select the medical care providers. Since plaintiff advises that she has changed her residence to Georgia, defendants need to select medical care providers in reasonable proximity to plaintiff.
 ***********
Based upon the foregoing stipulations and findings of fact, the Full Commission makes the following
 CONCLUSIONS OF LAW
1. Plaintiff unjustifiably refused suitable employment, a U-Scan position at Harris Teeter, which was offered to her on November 8, 2001, and approved by her treating physician. Such refusal was in violation of N.C. Gen. Stat. § 97-32.
2. Defendants have continued to pay temporary total disability benefits in the amount of $282.01 per week following plaintiff's refusal to accept the U-Scan position at Harris Teeter. Defendants are entitled to terminate such ongoing payment of benefits until such time as plaintiff complies with vocational rehabilitation and should be allowed a credit for total disability benefit payments made to plaintiff since November 19, 2001. N.C. Gen. Stat. § 97-32.
3. With regard to plaintiff's medical motion, defendants may continue to select the medical care providers to treat plaintiff, in a location suitable and appropriate with regard to plaintiff's residence. In the event that plaintiff continues to reside in Georgia and is not in reasonable proximity to North Carolina physicians, then physicians in proximity to her residence need to be selected. N.C. Gen. Stat. §§ 97-2(19), 97-25.
 ***********
Based upon the foregoing stipulations, findings of fact and conclusions of law, the Full Commission enters the following
 AWARD
1. Plaintiff's ongoing temporary total disability benefits are hereby suspended retroactively from November 19, 2001 due to plaintiff's refusal to accept suitable employment which was available, approved by her physicians and offered to her at the time, as well as her ongoing refusal to comply with vocational assistance and placement efforts.
2. Defendants are allowed a credit towards any benefits that may be awarded in the future in the amount of $282.01 per week based on their continued payment of temporary total disability benefits since November 19, 2001 until plaintiff complies with vocational rehabilitation.
3. Defendants shall continue to provide reasonably necessary medical treatment. In the event that plaintiff continues to reside in Georgia, defendants shall select medical care providers in a location in proximity to plaintiff.
4. Plaintiff is hereby Ordered to comply with the reasonable vocational rehabilitation and assistance provided by defendants.
Defendants shall pay the costs.
This the 8th day of September 2003.
 S/_______________ DIANNE C. SELLERS COMMISSIONER
CONCURRING:
 S/____________ BUCK LATTIMORE CHAIRMAN
 S/_______________ CHRISTOPHER SCOTT COMMISSIONER